IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-40613

_____


CELIA J CHIU; DENISE BROWN; VERONICA C JENKINS; DENISE
KIRKE; ALFRED G KIRKE; KENNETH R JOHNSON


                                    Plaintiffs - Appellees

     v.

PLANO INDEPENDENT SCHOOL DISTRICT; ET AL

                                    Defendants

JAMES DAVIS, DR, Plano Independent School District Central
Cluster Area Assistant Superintendent; MARILYN BROOKS,
Associate Superintendent for Curriculum and Instructions;
JAMES WOHLGEHAGEN, DR; ROXANNE BURLESON, Principal Haggard
Middle School; CORKY CRISWELL, Principal Hendrick Middle
School; BEVERLY SELLERS, Principal Wilson Middle School

                                    Defendants - Appellants
_____

           Appeal from the United States District Court
               for the Eastern District of Texas
_____
                          July 24, 2001
Before KING, Chief Judge, and ALDISERT[*] and BENAVIDES, Circuit
Judges.

PER CURIAM:

     Defendants-Appellants Dr. James Davis, Dr. James

Wohlgehagen, Roxanne Burleson, Corky Criswell, Beverly Sellers,

_____

     [*]  Circuit Judge of the Third Circuit, sitting by
designation.

and Marilyn Brooks, all educators or administrators in the Plano Independent School District, appeal from the district court's partial denial of summary judgment. Defendants-Appellants contend that they are entitled to qualified immunity in their individual capacities as to the 42 U.S.C. § 1983 claims raised by Plaintiffs-Appellees Alfred Kirke, Kenneth Johnson, and Veronica Jenkins,[1] all parents of children in the Plano Independent School District.

Specifically, Defendants-Appellants Davis, Wohlgehagen, Burleson, Criswell, and Sellers claim qualified immunity from Kirke's and Johnson's allegations that their First Amendment rights were violated when Kirke and Johnson were prevented from communicating with, and distributing information to, other parents at a school-sponsored curriculum meeting. Defendant Brooks claims qualified immunity from Jenkins's allegation that her First Amendment rights were violated when Jenkins was prevented from distributing an informational flyer through the school mail delivery system. For the following reasons, we dismiss Defendants Davis, Wohlgehagen, Burleson, Criswell, and Sellers's appeal from the denial of summary judgment based on qualified immunity for want of jurisdiction; however, we reverse the district court's denial of summary judgment based on qualified immunity as to Defendant Brooks.

---

[1] The other named Plaintiffs-Appellees do not have claims relevant to this appeal.

## I. FACTUAL BACKGROUND

This dispute centers around the implementation of a new math curriculum in the middle schools of the Plano Independent School District (the "PISD"). In response to the recognition that the PISD students were entering high school ill prepared to succeed in high school level math courses, the PISD decided to improve its middle school math curriculum. Beginning in the 1996-1997 school year, the PISD began instituting the "Connected Math Program" ("Connected Math") in four pilot middle schools: Armstrong, Bowman, Haggard, and Wilson. Connected Math is a three-year pre-algebra math program directed at the sixth, seventh, and eighth grades, which teaches students to think conceptually about math problems by emphasizing problem solving and group interaction and by helping students understand how math is applicable to their daily lives. During the 1999-2000 school year, the PISD instituted Connected Math district wide.

Plaintiffs-Appellees Alfred Kirke, Kenneth Johnson, and Veronica Jenkins (collectively "Plaintiffs") are parents of children enrolled in the PISD. Plaintiffs oppose Connected Math because they believe that the new approach sacrifices the acquisition of traditional computational skills and has not been proven to be a successful alternative to a traditional middle school math curriculum.

Defendants-Appellants are all PISD officials involved with

the implementation, administration, or teaching of Connected Math (collectively "Defendants").  Davis was the PISD Central Cluster Area Assistant Superintendent at the time of the dispute (now retired).  Wohlgehagen is the Coordinator for Secondary Mathematics for the PISD.  Burleson is the Principal at Haggard Middle School in the PISD.  Criswell is the Principal at Hendrick Middle School in the PISD.  Sellers is the Principal at Wilson Middle School in the PISD.  Brooks is the Associate Superintendent for Curriculum and Instruction at the PISD.

In this appeal from a denial of summary judgment on qualified immunity grounds, only the activities of Defendants as they relate to the activities of Kirke, Johnson, and Jenkins are relevant.  The factual situation leading to the allegations of each of these Plaintiffs will be addressed in turn.

### A. Haggard Middle School Math Night

In order to inform parents about the Connected Math pilot program, the PISD held a series of "Parent's Math Nights" ("Math Nights") at its middle schools.  These meetings were scheduled in the evening after school hours and were announced in a local paper and through flyers sent home with students.  The agenda of each Math Night included an introduction by the faculty about the curriculum's goals and objectives, a question-and-answer session, and an informal meeting period to allow parents and teachers to discuss the progress of individual students.

On August 25, 1998, Kirke attended a Math Night at Haggard

4

Middle School where his daughter was a student.  He had received a flyer sent home through his daughter inviting interested parents to meet with school officials about Connected Math. Kirke brought with him written materials he wished to distribute to other parents, including two articles that criticized new methods of teaching math that were similar to Connected Math. Kirke also brought a petition for parents to sign that requested the PISD to halt the implementation of Connected Math until an independent evaluation of the curriculum was undertaken.  This petition included a request that parents be given more input into the decision-making process concerning whether to choose Connected Math over more traditional math.

Kirke alleges that on the morning of August 25, he discussed with Burleson, the Principal of Haggard Middle School, his plan to distribute the materials at the Math Night meeting.  Burleson disputes that this discussion occurred.  Kirke arrived early to the Math Night meeting and again allegedly discussed his plan to distribute the materials with Burleson and Wohlgehagen, the PISD's Coordinator for Secondary Mathematics.  Kirke claims that neither of these Defendants objected to his distribution of literature to the parents that were present at the meeting. Kirke then placed his written materials on the same table that held a PISD handout concerning the implementation of Connected Math.  The PISD handout contained a brief description of Connected Math, an outline of research that had been conducted on

Connected Math, an explanation of the PISD implementation plan, and charts illustrating the performance gains of children in the Connected Math pilot program.

After several minutes, Kirke alleges that Burleson and Wohlgehagen asked him to remove his materials from the table of PISD materials. They requested that he move the literature critical of Connected Math to avoid the suggestion that the materials were endorsed by the PISD. Kirke complied with the request. Kirke explains that prior to the official start of the meeting, he would greet parents as they arrived and inform them of the materials he had brought. Kirke states that he was once again approached by Burleson and Wohlgehagen and asked to gather his materials and leave the meeting. In response, Kirke asked if he would be forced to leave the meeting if he refused to comply with their request to cease distributing the materials. Wohlgehagen told him that he would not be forced to leave.

Several minutes later, Kirke claims that Davis, the Assistant Superintendent in charge of the PISD's Central Cluster Area, told him that he would not be allowed to circulate the petition on school property. Kirke proceeded to put away his petition. Kirke alleges that Davis approached him two other times and requested that he cease distributing his materials to the parents in attendance. After Davis's final request, Kirke ceased distributing the materials.

Kirke also states that Burleson assured him that he would

6

have an opportunity to present his concerns regarding Connected Math following the PISD presentation. Defendants have admitted that Kirke was never given this opportunity. With the exception of distributing his materials and his personal communications with parents, Kirke did not otherwise voice his opposition to Connected Math at the Math Night meeting.

The following day, on August 26, 1998, Plaintiffs claim that Davis sent an email memorandum to all Central Cluster principals stating:

> I want to alert all of you of our district legal position regarding people coming on to your campus with petitions and material associated with the Connected Math Program. You are not to allow anyone to come on to your campus, inside or out, to circulate a petition or pass out material related to the Connected Math Program. The recent flap over the Connected Math Program has prompted some people to conduct personal campaigns supporting one side or the other. I think they will seek support wherever they can find it, including schools not using the program. Don't get caught napping on this one.

However, Davis denies authoring the email memorandum.[2]

---

[2] The district court recognized that the authorship of the email memorandum would be a question for the jury. The district court pointed to two of Davis's affidavits. The first states that he did author and distribute an email regarding the distribution of literature on campus, but that he did not believe that the email in the record was the one he authored. In his second supplemental affidavit, he unequivocally denied authoring the email.

The record also includes a sworn affidavit from Melinda McManus Shafer, a PISD parent and resident. In her affidavit, Shafer states: "Shortly after August 26, 1998, I was given a copy of a memo sent from Mr. Davis, then Area Superintendent for the Central Cluster, to central cluster principals. This memo was given to me by a Plano Independent School District employee who had been given this memo from his/her principal." Shafer also swore to the authenticity of the memorandum: "I have absolutely

7

## B. Wilson Middle School Math Night

On September 1, 1998, Kirke attended a second Math Night at the Wilson Middle School where his son was a student.  Kirke did not seek prior approval to distribute his materials, which included the articles critical of programs similar to Connected Math.  When he arrived, Kirke was approached by Davis and Sellers, the Principal of Wilson Middle School, and was informed that he would not be able to distribute his materials critical of Connected Math or collect signatures on his petition.  Kirke had also prepared a large poster that read:

> PISD officials told me that I can't pass out flyers or circulate a petition requesting a conventional math choice. For more information, see me after the meeting or call our hotline[.]

Davis and Sellers also told Kirke that he would not be allowed to display his sign at the Math Night.  According to Kirke's affidavit, he was informed by Davis and Sellers that he would not be able to hold the sign or be allowed to communicate the information contained on the sign anywhere on the school premises.  He was instructed to turn over the sign so parents would not be able to read it.  Kirke states that he complied with these instructions.  Kirke again did not participate in the

---

no reason to believe that the memo as I received from the district employee has in any way been altered or is not the exact copy as received by the central cluster principal from Dr. Davis, or as the employee received from the principal of the school where he/she was employed."

question-and-answer portion of the program.

### C. Hendrick Middle School Math Night

On October 12, 1998, Johnson attended a Math Night at Hendrick Middle School. Johnson had a daughter in the PISD school system, but his daughter did not attend Hendrick Middle School. Johnson brought a report to the Math Night that was prepared by the Texas Education Agency and that evaluated the Connected Math textbook and concluded that it was "nonconforming." The report, however, had also approved of the use of the Connected Math curriculum in Texas schools.[3] Johnson alleges that, prior to the meeting, he handed out this report to arriving parents. Johnson admits that he did not seek to obtain permission to distribute this literature. As he was distributing the materials to parents, Criswell, the Principal of Hendrick Middle School, informed Johnson that he would not be allowed to pass out literature unless the material had been reviewed and approved by school officials. Johnson alleges that Criswell was highly agitated and shouted at him. Johnson, then, offered Criswell an opportunity to view the Texas Education Agency's report, but Criswell declined to examine it. Criswell told Johnson that he would be required to leave the premises if he

---

[3] Apparently, an "approved" but "nonconforming" textbook under the Texas Education Agency's criteria does not teach all of the skills required by state standards. Under this standard, it is permissible for school districts to use such textbooks, but they must supplement the curriculum with other materials.

wished to continue distributing his materials. Johnson states that he put his materials away after this directive.

During the actual meeting, Criswell alleges that Johnson and other parents who opposed Connected Math were disruptive. Johnson denies his involvement in any disruption, but does admit that some of the parents interrupted the faculty presentation. Johnson did ask one or two questions, after raising his hand to be acknowledged, in the question-and-answer session.

### D. The Petition Drive

On March 25, 1999, Jenkins, a mother of a student at Armstrong Middle School, contacted Defendant Brooks, Associate Superintendent for Curriculum and Instruction for the PISD, to inquire about sending a flyer home with the PISD school children. The PISD has used school children to deliver informational flyers to their parents in the past. (This process, by which students are provided with information to take home to their parents, is hereinafter referred to as the "school mail delivery system.") Jenkins's proposed flyer was purportedly on behalf of "MathChoice," a non-profit, unincorporated group of parents concerned about the implementation of Connected Math. In addition to providing information critical of Connected Math, the flyer solicited the signatures of parents who desired an alternative to Connected Math. Brooks rejected the request to send the petition home with the children. The reason stated for denying the request was that "[o]nly non-profit groups providing

10

programming or services for students are allowed to send flyers home with students." The PISD concedes that organizations such as the P.T.A. and other school organizations have contacted parents through this method of delivery. Jenkins asserts that for-profit entities such as athletic summer camps and local amusement parks have also used the service. Jenkins eventually mailed the MathChoice petition to parents using the U.S. mails.

## II. PROCEDURAL HISTORY

On August 25, 1999, Plaintiffs filed their Original Complaint for Declaratory Judgment, Injunctive Relief, and Damages, seeking a judgment from the district court that Defendants' conduct violated Plaintiffs' constitutional rights. Relevant to this appeal, Kirke and Johnson brought suit under 42 U.S.C. § 1983 alleging that their First Amendment rights to freedom of speech were abridged by the PISD when they were not allowed to distribute literature, display signs, or collect signatures on a petition at the Math Nights. Jenkins also brought suit under 42 U.S.C. § 1983, alleging that her First Amendment right was violated when she was denied the opportunity to send a petition home with students that criticized Connected Math. Plaintiffs also brought other federal and state claims not relevant to this appeal; those claims were denied in the district

11

court.[4]

On February 11, 2000, Defendants moved for summary judgment, based, in part, on qualified immunity.  Regarding the First Amendment issues relevant to this appeal, Defendants argued that Plaintiffs could not demonstrate that a clearly established constitutional right had been violated, and that, even if such a violation could be demonstrated, their actions were objectively reasonable.

On May 5, 2000, the district court issued its Order resolving the issue of qualified immunity.  Regarding Kirke's and Johnson's First Amendment claims, the district court concluded that it must deny Burleson, Criswell, Wohlgehagen, Davis, and Sellers's motion for summary judgment insofar as it asserted qualified immunity.  The district court determined that, in examining the summary judgment evidence in the light most favorable to Plaintiffs, Kirke and Johnson had alleged a violation of a clearly established constitutional right, in that, the actions of the individual Defendants created an inference of impermissible content-based discrimination.  Regarding Jenkins's

---

[4]    The district court held that members of the PISD Board of Trustees were entitled to qualified immunity in their individual and official capacities on Plaintiffs' First Amendment claims.  The district court also granted Defendants' motion for summary judgment on Plaintiffs' claims under the Fourteenth Amendment and § 26.003 of the Texas Education Code that the parents had a right to direct the education of their children. Furthermore, the district court denied Plaintiffs' request for class certification.

12

request to use the PISD school mail delivery system, the district court "declined to address" Brooks's summary judgment argument based on qualified immunity because additional discovery was necessary to determine whether there was content-based discrimination motivating the denial of her request to distribute the MathChoice petition.[5]

Defendants, in their individual capacities, timely appeal the denials of summary judgment on qualified immunity grounds.

### III. APPELLATE JURISDICTION

As an initial matter, we address our jurisdiction to hear this interlocutory appeal. "District court orders denying summary judgment on the basis of qualified immunity are immediately appealable under the collateral order doctrine, notwithstanding their interlocutory character, when based on a conclusion of law." Lukan v. N. Forest ISD, 183 F.3d 342, 345 (5th Cir. 1999) (internal quotations omitted) (quoting Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 531 (5th Cir. 1997)); see also Jones v. City of Jackson, 203 F.3d 875, 878 (5th Cir. 2000) ("Typically, denials of qualified immunity, although not final orders, are immediately appealable under the collateral order doctrine set forth in Cohen v. Beneficial Industrial Loan

---

[5]  We interpret the district court's decision as effectively denying the motion for summary judgment on the basis of qualified immunity.

13

<u>Corp.</u>, 337 U.S. 541 (1949)."). "If disputed factual issues material to summary judgment are present, the district court's denial of summary judgment on the basis of immunity is not appealable." <u>Jones</u>, 203 F.3d at 878 (internal quotations omitted) (quoting <u>Lampkin v. City of Nacogdoches</u>, 7 F.3d 430, 431 (5th Cir. 1993)).

We determine <u>infra</u> that Kirke and Johnson have alleged a violation of a clearly established constitutional right, but that the presence of genuine issues of material fact about whether that right was violated deprive us of appellate jurisdiction over the appeals of Defendants Davis, Wohlgehagen, Burleson, Criswell, and Sellars from the denial of qualified immunity.

Our appellate jurisdiction over the denial of qualified immunity regarding Jenkins's First Amendment claim against Brooks is a more difficult issue to resolve. The district court did not decide Brooks's motion for summary judgment based on qualified immunity, finding instead, insufficient facts precluded a determination on the issue.[6]

---

[6]  The district court reasoned:

> [T]he Court is persuaded that summary judgment on this issue is premature. Without discovery, the Court is unable to determine what PISD's policy is on the issue of access to its mails, and the degree to which it has opened this system to the public. Without this information, the Court is unable to judge either the degree to which clearly established rights are implicated or the reasonableness of the individual Defendants' actions.

14

Appellate jurisdiction over denials of qualified immunity on the basis that factual issues exist turns on the type of facts at issue.  See Colston v. Barnhart ("Colston II"), 146 F.3d 282, 284 (5th Cir. 1998) (denying pet. for reh. en banc); see also Colston v. Barnhart, 130 F.3d 96, 98 (5th Cir. 1997).  In Colston II, this court recognized that when a district court denies a motion for summary judgment on the basis that there exist genuine issues of material fact, it is actually making two separate legal conclusions:

> First, the court has concluded that the issues of fact in question are genuine, i.e., the evidence is sufficient to permit a reasonable factfinder to return a verdict for the nonmoving party.  Second, the court has concluded that the issues of fact are material, i.e., resolution of the issues might affect the outcome of the suit under governing law.

Id. (citations omitted).  As this court explained in Lemoine v. New Horizons Ranch & Center, Inc.:

> Whether we have appellate jurisdiction turns on which of these conclusions is being challenged on appeal.  We do not have appellate jurisdiction over the first type of conclusion because such conclusions are nothing more than a determination of the sufficiency of the evidence — a finding which, in turn, is not truly separable from the underlying claim and is thus not a "final order" under the collateral order doctrine.  On the other hand, we do have appellate jurisdiction over the second of these conclusions because it is a legal determination.

174 F.3d 629, 634 (5th Cir. 1999).  Therefore, "[i]n deciding an interlocutory appeal of a denial of qualified immunity, we can review the materiality of any factual disputes, but not their genuineness."  Wagner v. Bay City, 227 F.3d 316, 320 (5th Cir. 2000).  In making this legal determination on the materiality of

15

the facts at issue, "we review the complaint and record to determine whether, assuming that all of [Plaintiffs'] factual assertions are true, those facts are materially sufficient to establish that defendants acted in an objectively unreasonable manner." Id. ("Even where . . . the district court has determined that there are genuine disputes raised by the evidence, we assume plaintiff's version of the facts is true, then determine whether those facts suffice for a claim of [the constitutional violation alleged].").

The district court determined that it was unable to determine the scope of the PISD's policy as to access to its mails, or the degree to which the PISD has opened this system to the public. On appeal, Brooks asserts that these disputed facts are material in determining whether a constitutional right was violated, a legal inquiry that could resolve the qualified immunity question. Specifically, Brooks is challenging the materiality of the facts at issue regarding whether she violated the First Amendment in denying Jenkins's request to utilize the school mail delivery system. See Colston II, 146 F.3d at 284 (defining "material" as involving issues, the resolution of which "might affect the outcome of the suit under governing law"). Because we are reviewing the materiality of the facts at issue regarding the school mail delivery system, we have appellate jurisdiction to hear Brooks's interlocutory appeal of the denial of her qualified immunity. Following Wagner, we will assume all

16

of the facts presented by Jenkins to be true in order to determine the legal issue of qualified immunity.  See 227 F.3d at 320.

## IV. STANDARD OF REVIEW

This court reviews de novo the district court's denial of a motion for summary judgment based on qualified immunity.  See Benningfield v. City of Houston, 157 F.3d 369, 374 (5th Cir. 1998); see also Mendenhall v. Riser, 213 F.3d 226, 230 (5th Cir. 2000); Spivey v. Robertson, 197 F.3d 772, 774 (5th Cir. 1999).  "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)).  The moving party bears the burden of showing the district court that there is an absence of evidence to support the nonmoving party's case.  See id. at 325.  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response.  If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  Tubacex, Inc. v. M/V Risan, 45 F.3d 951, 954 (5th Cir. 1995).  The summary

judgment evidence is viewed in the light most favorable to the nonmovant, with all factual inferences made in the nonmovant's favor.  See Behrens v. Pelletier, 516 U.S. 299, 309 (1996).  We will affirm the denial of summary judgment based on qualified immunity if there exists a genuine issue of material fact or if the moving party is not entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Celotex Corp., 477 U.S. at 322.

## V. QUALIFIED IMMUNITY

As a general rule, public officials acting within the scope of their official duties are shielded from civil liability by the qualified immunity doctrine.  See Harlow v. Fitzgerald, 457 U.S. 800, 815-19 (1982); Morris v. Dearborne, 181 F.3d 657, 665 (5th Cir. 1999).  This doctrine protects officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow, 457 U.S. at 818; Kipps v. Callier, 197 F.3d 765, 768 (5th Cir. 1999).

We apply a two-step analysis to determine whether a public official is entitled to qualified immunity.  "First, we must examine whether the plaintiff has alleged a violation of a clearly established right."  Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000); see also Petta v. Rivera, 143 F.3d 895, 899 (5th Cir. 1998).  This circuit has refined this

18

first prong into three separate components.  See Wallace v. Wellborn, 204 F.3d 165, 167 (5th Cir. 2000).  In Wallace, we stated the test:

> First, the plaintiff must allege the deprivation of a constitutional right.  Second, we must determine whether this right was clearly established at the time of the alleged violation.  Finally, we must determine whether the record at least gives rise to a genuine issue of material fact as to whether the defendants actually engaged in the conduct that violated this clearly established right.

Id.  "For a constitutional right to be clearly established, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 455 (5th Cir. 1994) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)); see also Petta, 143 F.3d at 899.[7]

"Second, we must ask whether the defendants' conduct was objectively reasonable in light of 'clearly established' law at the time of the alleged violation."  Goodson, 202 F.3d at 736 (quoting Siegert v. Gilley, 500 U.S. 226, 231-32 (1991)); see

---

[7]  The term "'clearly established' does not necessarily refer to commanding precedent that is factually on all-fours with the case at bar or that holds that the very action in question is unlawful."  Morris, 181 F.3d at 665.  Instead, the right is clearly established if it is based on pre-existing law, and the unlawfulness of the conduct in question is apparent.  See Shipp v. McMahon, 234 F.3d 907, 915 (5th Cir. 2000); Taylor Indep. Sch. Dist., 15 F.3d at 455 ("Put another way, officials must observe general, well-developed legal principles." (internal quotations and citations omitted)).  Furthermore, the applicable law must be clearly established at the time of the allegedly actionable conduct.  See Morris, 181 F.3d at 665; Stem v. Ahearn, 908 F.2d 1, 5 (5th Cir. 1990).

19

also <u>Petta</u>, 143 F.3d at 899-900 ("If the plaintiff [states a constitutional violation], the judge then determines whether the defendant's actions were 'objectively reasonable' with reference to 'clearly established law' at the time of the conduct in question."). Having laid out the qualified immunity framework, we will employ it in the context of the alleged First Amendment violations.

## VI. FIRST AMENDMENT ANALYSIS

Under the first prong of our qualified immunity analysis, we must determine whether Plaintiffs have alleged a violation of a clearly established right. <u>See</u> <u>Evans v. Ball</u>, 168 F.3d 856, 860 (5th Cir. 1999) ("We may not pretermit the first prong but must decide whether [plaintiff] has alleged <u>any</u> constitutional violation before we may move to the inquires under the second prong."). Kirke and Johnson have alleged that by infringing on their speech and expressive activities at the Math Nights, Defendants have violated the First Amendment. Jenkins asserts that by denying her request to use the school mail delivery system to distribute an informational petition, Brooks violated the First Amendment. In the following analysis, we determine whether Plaintiffs have alleged a violation of a clearly established right.

### A. Protected Expression

As an initial matter, we determine that the expression at issue is protected under the First Amendment.[8]  The subject matter, involving debate over a change in public school curriculum, is an issue of public concern for the parents of students enrolled in the school district.  Further, activities such as speaking, distributing literature, displaying signs, petitioning for change, and disseminating information concerning issues of public concern are central to the protections of the First Amendment.  See, e.g., Martin v. City of Struthers, 319 U.S. 141, 143 (1943) ("The right of freedom of speech and press has broad scope.  This freedom embraces the right to distribute literature, and necessarily protects the right to receive it." (internal citation omitted)); see also Schenck v. Pro-Choice Network, 519 U.S. 357, 377 (1997) ("Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment."); Boos v. Barry, 485 U.S. 312, 318 (1988) (recognizing public issue signs to be classic examples of free speech); Meyer v Grant, 486 U.S. 414, 422 n.5 (1988) (recognizing that the solicitation of signatures for a petition drive involves protected speech).  As neither party seriously contests this issue, we turn to an evaluation of the speech

---

[8]  In pertinent part, the First Amendment provides that "Congress shall make no law . . . abridging freedom of speech, or of the press."  U.S. CONST. amend. I.  It applies to the states by virtue of the Fourteenth Amendment.  See Gitlow v. New York, 268 U.S. 652, 666 (1925); Grosjean v. Am. Press Co., 297 U.S. 233, 244 (1936).

21

regulations implicated by the Plaintiffs' allegations.

### B. First Amendment Forum Analysis

For First Amendment purposes, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." Perry Educ. Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37, 44 (1983). Thus, our determination of the character of the forum in which expression was regulated shapes our determination whether a clearly established right existed and our ultimate conclusion whether a constitutional violation occurred.

The Supreme Court has adopted a tripartite forum-based framework to analyze First Amendment issues involving governmentally owned property. "[T]he Court [has] identified three types of forums: the traditional public forum, the public forum created by governmental designation, and the nonpublic forum." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802 (1985).

Traditional public forums are places that "'by long tradition or by government fiat have been devoted to assembly or debate.'" Estiverne v. La. State Bar Ass'n, 863 F.2d 371, 376 (5th Cir. 1989) (quoting Cornelius, 473 U.S. at 802). This type of forum includes "streets and parks which 'have immemorially been held in trust for the use of the public and, time out of

22

mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Perry, 460 U.S. at 45 (quoting Hague v. CIO, 307 U.S. 496, 515 (1939)). "The state's efforts to exclude speakers from such traditional public forums are subject to rigorous first amendment scrutiny." Estiverne, 863 F.2d at 376. In these areas, the state regulation must withstand strict scrutiny, i.e., show that a content-based prohibition serves a compelling state interest and is narrowly tailored. See Perry, 460 U.S. at 45.[9]

In addition to traditional public forums, "a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." Cornelius, 473 U.S. at 802 (reasoning that a designated public forum exists when the government "intentionally open[s] a nontraditional public forum for public discourse"); see also Perry, 460 U.S. at 45. The state's power "to restrict speakers' access to this category of public forum is subject to the same first amendment constraints that apply to traditional public forums." Estiverne, 863 F.2d at 376; see also Perry, 460 U.S. at 45 ("The Constitution forbids a state to enforce certain

---

[9] In traditional public forums, "[t]he state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Perry, 460 U.S. at 45.

23

exclusions from a forum generally open to the public even if it was not required to create the forum in the first place.").

Despite the acceptance of a middle category between traditional and nonpublic forums, there is some confusion over the terminology used to describe this category. Two terms — "designated public forum" and "limited public forum" — have been utilized by the Supreme Court,[10] our sister circuits,[11] and this

_____

[10] At times, the Supreme Court has referred to limited public forums as being a subcategory within a designated public forum. See Widmar v. Vincent, 454 U.S. 263, 273-74 (1981) (holding that a state university had created a limited public forum by making its facilities generally available for the activities of registered student groups); Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992) ("The second category of public property is the designated public forum, whether of a limited or unlimited character — property that the State has opened for expressive activity by part or all of the public." (emphasis added)). In more recent cases, however, the Court has used the phrase "limited public forum" to describe a type of nonpublic forum of limited open access. See Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829 (1995) (finding that a state university had created a limited public forum by allowing registered student groups access to a student activities fund, but applying the reasonableness test used in nonpublic forum analysis). However, in Santa Fe Independent School District v. Doe, the Supreme Court once again used the phrase limited public forum to designate the intermediate forum category, as opposed to a nonpublic forum. See 530 U.S. 290, 304 (2000).

[11] Our sister circuits have also failed to reach a consensus on the distinction between a designated public forum and a limited public forum. See Diloreto v. Downey Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 965 (9th Cir. 1999) (distinguishing between "a designated public forum subject to heightened scrutiny or a limited public forum subject to the reasonableness standard"); Whiteland Woods, L.P. v. Township of W. Whiteland, 193 F.3d 177, 182 n.2 (3d Cir. 1999) (recognizing distinction between designated and limited public forums and applying the same constitutional requirements to both); see also Putnam Pit, Inc. v. City of Cookeville, 221 F.3d 834, 842 n.5

court,[12] yet there has not been agreement on their meaning. Specifically, it has not been clear whether the terms could be used interchangeably to describe the middle tier of forum, or in fact described different types of forums subject to different

_____

(6th Cir. 2000) (recognizing "that there has been some uncertainty among the circuits as to whether there are one or two categories of forums other than 'public' and 'nonpublic,' and what protection is due to these categories"); Summum v. Callaghan, 130 F.3d 906, 916 n.14 (10th Cir. 1997) ("We recognize that the boundary between a designated public forum for a limited purpose (e.g., Widmar) and a limited public forum (e.g., Rosenberger and Lamb's Chapel) is far from clear. . . . We simply note that a designated public forum for a limited purpose and a limited public forum are not interchangeable terms.").

[12] In earlier opinions, this court did not distinguish in our terminology between designated public forums and limited public forums. See Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 777 F.2d 1046, 1050 (5th Cir. 1985) (using limited public forum as the second category in the forum analysis); Hays County Guardian v. Supple, 969 F.2d 111, 118 (5th Cir. 1992) (finding that a university campus was "a limited public forum, designated for the speech of students"). More recently, our cases seem to accept the concept of a limited public forum as being a subcategory of the designated public forum, the regulation of which is subject to less rigorous scrutiny. In Doe v. Santa Fe Independent School District, this court applied a First Amendment forum analysis to prayers delivered at a high school football game. While the majority and the dissent disagreed about the application of the standards, both seemingly accepted that limited public forums fell within some part of the designated public forum category. Compare 168 F.3d 806, 819 (5th Cir. 1999) (majority opinion) ("A designated public forum may, of course, be limited to a specified class of speakers or to discussion of specified subjects — thus the term limited public forum. Nevertheless, the State does not create a designated public forum by inaction or by permitting limited discourse." (internal citation omitted)), with id. at 831 (dissenting opinion) ("A subset of designated public forums is the 'limited public forum.' Such a forum is created when the government limits the purpose of the forum by, for example, placing a limitation on use by certain groups or on the discussion of certain subjects.").

25

levels of First Amendment scrutiny.  The Supreme Court has recently used the term "limited public forum" to describe forums opened for public expression of particular kinds or by particular groups.   Good News Club v. Milford Central School, -- U.S. –, 121 S.Ct. 2093, 2100 (2001) (treating school facilities opened by a school district for a wide, but not unlimited, range of public expressive activities as a "limited public forum," based on agreement by the parties); Rosenberger, 515 U.S. at 829, 115 S.Ct at 2516-17 (describing campus facilities opened to various student groups as a "limited" forum).  When a public body establishes a limited public forum of this sort, that body may restrict the expression that takes place within the forum so long as the restriction (1) does "not discriminate against speech on the basis of viewpoint" and (2) is "reasonable in light of the purpose served by the forum." Milford Central, 121 S.Ct. at 2100. Because the level of scrutiny applied to government regulation of speech in a "limited public forum" differs from that applied to regulation of speech in a "designated public forum," it now seems clear that the two terms are not synonymous and should not be used interchangeably.

Though the Supreme Court now clearly distinguishes designated public forums subject to strict scrutiny from limited public forums that are not, the line separating the two categories remains undefined.  In distinguishing between the two types of forums, our precedent directs us to focus on two

26

factors: (1) the government's intent with respect to the forum, and (2) "the nature of the [forum] and its compatibility with the speech at issue." Estiverne, 863 F.2d at 378. Government intent with regard to the forum is the critical starting point for determining whether regulation of speech in a particular forum should be subject to strict scrutiny. The Supreme Court has consistently emphasized that public entities have broad discretion to control access to and use of property or events that are not traditional public forums. Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998) ("Designated public fora, . . . are created by purposeful governmental action."); Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449. The government does not automatically designate a public forum "by permitting limited discourse" or "selective access." Ark. Educ. Television, 523 U.S. at 677. The government creates a designated public forum "only by intentionally opening a nontraditional forum for public discourse." Cornelius, 473 U.S. at 805, 105 S.Ct. at 3449; see also Hays County Guardian v. Supple, 969 F.2d 111, 116 (5th Cir. 1992) (looking "to whether the government was motivated by 'an affirmative desire,' or 'express policy' of allowing public discourse on the property in question."). If, simply by opening a facility for limited public discourse, the government were to designate a public forum, the regulation of which would be subject to strict scrutiny, the government might elect not to open such property for any public discourse. Ark. Educ.

27

Television, 523 U.S. at 681. That result would conflict with the broad First Amendment policy of encouraging public discourse on issues of community interest. Id. However, once the government has designated a particular forum as appropriate for certain types of speech or for speech on particular topics, "speech for which the forum is designated is afforded protection identical to the protection provided to speakers in a traditional public forum." Supple, 969 F.2d at 116; Ark. Educ. Television, 523 U.S. at 677 ("If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny" (citations omitted)).

Public property that is not by tradition or designation open for public communication is governed by nonpublic forum standards. See Estiverne, 863 F.2d at 376 ("[A] forum may be considered nonpublic where there is clear evidence that the state did not intend to create a public forum or where the nature of the property at issue is inconsistent with the expressive activity, indicating that the government did not intend to create a public forum."). A nonpublic forum, however, is not a private forum, and because it is a government-sponsored medium of communication, it is still subject to First Amendment constraints. See Estiverne, 863 F.2d at 378 n.9. As with limited public forums, "[t]he government can restrict access to a nonpublic forum 'as long as the restrictions are reasonable and

28

[are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" <u>Ark. Educ. Television</u>, 523 U.S. at 677-78 (quoting <u>Cornelius</u>, 473 U.S. at 800).

<u>C. Application of the First Amendment Forum Framework</u>

Plaintiffs' First Amendment claims can be broken down into two analytical categories: the first involves Kirke's and Johnson's rights at the Math Nights, and the second involves Jenkins's request to distribute a petition through the school mail delivery system. As is evident, the Math Nights attended by Kirke and Johnson and held in the various PISD middle schools are not historically recognized as "traditional" public forums akin to streets or parks. Similarly, the school delivery system by which Jenkins wished to distribute her petition is not a "traditional" public forum. <u>See</u> <u>Perry</u>, 460 U.S. at 45. Whether these forums are better characterized as designated public forums subject to strict scrutiny, or limited public / nonpublic forums is a more difficult question.

<u>1. Forum Analysis: Math Nights</u>

To determine whether a forum such as a Math Night is a designated public forum as opposed to a limited or nonpublic forum, we must first ask whether the Math Nights were purposefully created to facilitate discussion or debate on math curriculum. The Court has recognized that "school facilities may be deemed to be [designated] public forums only if school authorities have 'by policy or by practice' opened those

29

facilities 'for indiscriminate use by the general public,' or by some segment of the public, such as student organizations." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267 (1988) (citations omitted); see also Widmar v. Vincent, 454 U.S. 263, 267-68 (1981) (finding university facilities to be limited (i.e., designated) public forums). Additionally, however, the Court has held that events such as school board meetings can rise to the level of designated public forums, such that regulation of public expression at such meetings would be subject to strict scrutiny. City of Madison, 429 U.S. at 174-75 (treating the school board meeting at issue as a designated public forum); Estiverne, 863 F.2d at 378 (noting that the Supreme Court had held "a public school board meeting" to be a designated public forum). In City of Madison, the Court noted that the public facilities in question had been "opened [publicly as] a forum for direct citizen involvement" and that the prohibited speech involved a relevant matter of public concern. City of Madison, 429 U.S. at 174-75. Thus, when school district authorities elect to open public school facilities after school hours for public meetings during which public issues will be discussed in a manner similar to a limited-topic school board meeting, the district officials have designated a public forum for the limited time and topic of the meeting. Whether Math Nights were such a designated public forums similar to school board meetings subject to strict scrutiny or more limited public forums subject to less rigorous

30

judicial review depends on what the PISD intended to accomplish through Math Nights.  If the PISD intended to present information about the implementation of the pilot Connected Math program and what changes parents of children in the program might expect, such a limited forums would not rise to the level of a designated public forum.  If, however, the PISD intended to allow and respond to questions relating to the propriety of Connected Math as a curricular option, and intended to allow debate over the merits of the program, then Math Nights would seem more akin to school board meetings and more rigorous scrutiny of restrictions on speech related to math curriculum would be appropriate.

Because this summary judgment record is not clear as to what the PISD intended with respect to Math Nights at the time that the events were organized, we are presently unable to categorize their status as a matter of law.  Construing the evidence in the light most favorable to Plaintiffs, a reasonable fact-finder could conclude that the PISD intended to create a forum to facilitate discussion of math curriculum, an important issue of public concern.  The agenda handed out to parents as they entered the building specifically allotted time for questions and answers, as well as small group discussion with teachers and district administrators.  Moreover, affidavit testimony from Kirke states that Defendants Burleson and Wohlgehagen initially allowed Kirke to distribute materials relating to Connected Math at the first Math Night, held at Haggard Middle School.  Such

31

conduct supports a reasonable inference that Defendants initially intended to allow open, yet structured, expression on math curriculum reform at Math Nights.  Finally, as the district court noted, it is reasonable to infer from a letter written by Plano Board of Trustees member Muns that the PISD intended Math Nights to provide "opportunities for people to express their concerns, positively or negatively, regarding the Connected Math series." Cumulatively, this evidence, when viewed in the light most favorable to the Plaintiffs, suggests that Math Nights could have been intended as small-scale school board meetings, at which a math curriculum pilot program was to be discussed and information on its merits provided.  Such a meeting could properly be considered a designated public forum, such that regulation of expression on the theme of the meeting would be subject to strict scrutiny.

But the record also contains evidence suggesting that the PISD intended the scope of Math Nights to be much more limited. The invitation used to invite parents to attend Math Nights was quite general and made no mention of open debate or presentation of materials by individuals other than district-officials. Kirke, for example, was invited to Haggard Middle School by a flyer that simply stated: "You are invited to Haggard Math Night for parents."  Moreover, Defendants state in their affidavits[13]

---

[13]  Of course, Defendants' self-serving statements regarding the purpose of the meeting are not enough to prove "intent" on

32

that Math Nights were organized to educate parents, not to provide a forum to debate the issue of Connected Math.  Finally, Defendants' attempts to restrict distribution of materials at the Math Night, while raising the constitutional concerns about viewpoint discrimination that will be addressed later, also evince an intent to restrict the openness of the forum.

The uncertainty as to the PISD's intent with respect to Math Nights also affects our analysis under the "extent of the use granted" prong.  This court has phrased the analytical approach to this element in common-sense terms: "[D]oes the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for communication of views on issues of political and social significance[?]"  Estiverne, 863 F.2d at 378-79 (citations and internal quotations omitted) (alterations in original); see also Doe, 168 F.3d at 820.  Curricular discussions are appropriate in school buildings and could be part of a larger pattern of curricular reform debate.  By the same token, a school district could have a reasonable interest in educating parents on the implementation of a pilot curricular program without the distraction of having to defend the merits of the program.  The difficulty in this case is that we do not know clearly what the

_____

this matter.  See Doe, 168 F.3d at 820.

33

PISD intended to accomplish through Math Nights.

Our inability to resolve the forum question on this summary judgment record does not affect our resolution of this appeal, however, because Plaintiffs have alleged viewpoint discrimination that would, if proven, violate the First Amendment whether Math Nights were designated or limited/nonpublic forums. See Hobbs v. Hawkins, 968 F.2d 471, 481 (5th Cir. 1992)(noting that "forum analysis is not readily susceptible to summary dismissal [pursuant to Rule 12(b)(6)] . . . . especially when the complaint alleges viewpoint discrimination, because viewpoint discrimination violates the First Amendment regardless of the forum's classification.")

### 2. Forum Analysis:  The School Mail Delivery System

Analysis of Jenkins's request to have her "MathChoice" flyers distributed through the school mail delivery system also turns on whether the school mail system is a designated public forum or a limited/nonpublic forum.  In Perry, the Supreme Court held that a school district's internal mail system was a nonpublic forum.  See 460 U.S. at 47.  The Court found that because the school district had not opened its mail system up to the general public, it was not a traditional public forum or a designated public forum.  Further, the Court held that the grant of selective access to organizations such as the YMCA and the Cub Scouts did not require the school to open up the system to the union literature at issue in that case.  See id.  Because the

34

PISD in this case has not opened up its school mail delivery system to the general public, under Perry, it is properly considered a limited/nonpublic forum.

We recognize that on one occasion, this circuit narrowly construed Perry in reference to another dispute involving a school mail system. See Ysleta Fed'n of Teachers v. Ysleta Indep. Sch. Dist., 720 F.2d 1429, 1433 (5th Cir. 1983). In Ysleta, this court distinguished Perry, finding that a school district had adopted a policy to open the mail system to "all employee organizations." The court found that once the school opened its mail system to information from all employee programs, it was a designated public forum for that purpose. See id.

However, in Texas State Teachers Ass'n v. Garland Independent School District, this court followed the reasoning in Perry. See 777 F.2d 1046, 1053 (5th Cir. 1985). The Garland court looked at the extent of openness in the school mail system and determined that the selective access of certain groups did not transform the system into an open public forum for use by the petitioning "employee organization." See id. at 1052. We find the instant case to be more analogous to Garland, as there is no evidence that the PISD's selective opening of the school mail system was intended to create a designated public forum for use by the general public. Unlike Math Nights, there is no evidence that the PISD intended the school mail system to facilitate debate on issues of public concern. Therefore, under Perry and

35

Garland, we hold that the school mail delivery system is a nonpublic forum.

### D. Analyzing Plaintiffs' Constitutional Allegations

Kirke and Johnson have asserted that their expressive activities were targeted because of their viewpoint critical of Connected Math. Jenkins has asserted that the denial of her MathChoice flyer and petition was because of the views expressed in the document. It is well settled that viewpoint discrimination is a clearly established violation of the First Amendment in any forum. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828, 829 (1995) (finding that viewpoint discrimination is a form of content discrimination, in which "the government targets not subject matter, but particular views taken by speakers on a subject." (citing R.A.V. v. City of St. Paul, 505 U.S. 377, 391 (1992))). "Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Id. Even if Math Nights were determined to be nonpublic forums, government actors may not discriminate on the basis of the views espoused. See Hobbs, 968 F.2d at 481 ("[V]iewpoint discrimination violates the First Amendment regardless of the forum's classification.").

36

We are satisfied that Plaintiffs have alleged that a First Amendment right to be free from viewpoint discrimination exists and that this right was clearly established. The final component of our first prong of the qualified immunity analysis requires us to determine "whether the record shows that the violation occurred, or at least gives rise to a genuine issue of material fact as to whether the defendant actually engaged in the conduct that violated the clearly-established right." Morris v. Dearborne, 181 F.3d 657, 665 (5th Cir. 1999) (internal quotations and citations omitted). If we determine that genuine issues of material fact exist regarding whether these Defendants violated the First Amendment, this determination deprives us of jurisdiction on this interlocutory appeal. See Palmer v. Johnson, 193 F.3d 346, 353 (5th Cir. 1999).

### 1. Viewpoint Discrimination at Math Nights

The district court determined that from the summary judgment evidence adduced, inferences could be drawn that Defendants Davis, Wohlgehagen, Burleson, Criswell, and Sellers acted because of content-based[14] discrimination, and thus, for the purposes of evaluating qualified immunity, a constitutional violation had been alleged. Viewing the evidence in the light most favorable to Kirke and Johnson, we conclude that genuine issues of material

---

[14] The district court found the discrimination to be "content" based. We interpret this finding as being more properly characterized as "viewpoint"-based discrimination.

37

fact exist as to whether these Defendants engaged in the alleged viewpoint discrimination; thus, we are deprived of jurisdiction on this interlocutory appeal.

First, a genuine issue of material fact exists as to whether Kirke was, in fact, prohibited from distributing information to the parents in attendance at both Haggard Math Night and Wilson Math Night.  Kirke claims he was repeatedly instructed to cease distributing information to the parents at Haggard Math Night.[15] He asserts that Wohlgehagen even asked him to leave the meeting. Defendants assert that because Kirke had the opportunity to pass out his materials before and after the meeting, and because he was able to do so, there was no infringement on free expression. In their affidavits, Defendants do not address whether Kirke's allegations regarding their actions at Math Night are accurate. Kirke also claims that at the Wilson Math Night he was instructed from the outset that he was not to distribute any information to parents.  Defendants again argue that Kirke was able to distribute this information before or after that meeting.

Second, if Kirke's materials were, in fact, prohibited, a genuine issue of material fact exists as to whether Kirke's materials were prohibited because of the views expressed or because of another permissible reason.  Kirke asserts that when

_____

[15]  In his affidavit submitted in opposition to Defendants' motion for summary judgment, Kirke asserts that he brought to the August 25, 1998 meeting two documents focused on the perceived difficulties with Connected Math.

38

he arrived at Haggard Math Night, he placed his Connected Math materials next to the PISD's Connected Math materials. Initially, there was no concern over his distribution of information concerning Connected Math. Eventually, Wohlgehagen reviewed the materials that Kirke placed on the table. According to Wohlgehagen's affidavit, he states, "I reviewed Mr. Kirke's materials and informed him that his materials did not relate to the new math curriculum at Haggard M[iddle] S[chool]." Wohlgehagen then asked Kirke to move his materials critical of Connected Math so that they would not be confused with the information provided by the PISD.

Kirke removed his materials from the table but continued speaking with parents. Kirke asserts in his affidavit that it was because he was successfully meeting with parents and distributing his information critical of Connected Math that Defendants Wohlgehagen, Burleson, and Davis told him to cease distributing the information. Kirke alleges that the motivation for this request to stop disseminating information and the order to actually leave the meeting was likely because Wohlgehagen and Burleson were concerned with the critical views being expressed to the other parents. Kirke points out that the school officials had not initially banned his materials, but only did so after reviewing them.[16] Defendants assert, however, that the reason

---

[16] Further, Kirke points to the fact that, as this was several minutes before the meeting was to begin, he was not

39

for their actions was that Kirke had not requested prior permission from school officials to distribute materials.[17]  This question regarding Defendants' motivation creates a genuine issue of material fact that cannot be decided on this appeal.

Third, an issue of fact exists regarding whether Davis and Sellers, in fact, ordered Kirke to put away his sign at the Wilson Math Night, and whether they did so because of the viewpoint expressed.  Kirke alleges in his affidavit that Davis and Sellers told him that he would not be allowed to hold his sign or to attempt to communicate the information contained on his sign by placing the sign anywhere on the school premises. Kirke alleges that Davis and Sellers instructed him to remove the sign or turn it over so that other parents would not be able to

---

interfering with the PISD speakers.  In addition, following what he understood to be the purpose of the meeting, he was providing information on the subject of Connected Math.  There is no allegation by Defendants that Kirke's actions were disruptive to the Math Night program itself.

[17]  This also raises another genuine factual dispute as to whether Kirke received permission from Burleson on the morning of August 25, 1998 to distribute information to the parents at the Haggard Math Night.  Kirke alleges he met with Burleson the morning of the meeting and explained that he was going to pass out materials on Connected Math that evening.  Kirke asserts that Burleson had no objection at the time.  Burleson denies the meeting.  This fact question is genuine and material because Defendants argue that they did not prohibit Kirke from distributing information because of viewpoint, but because he failed to receive prior permission from school officials. Further, it supports Kirke's viewpoint argument that the school officials were not concerned with literature being distributed to parents regarding Connected Math until after Wohlgehagen realized that the material was critical of Connected Math.

read the message contained on the sign critical of Connected Math. Davis and Sellers respond that his poster was available for the parents to see at the meeting. Again, whether Defendants acted in the manner Kirke alleges and whether Defendants acted because of the method of expression or the views expressed are genuine issues of material fact that we cannot decide on this appeal.[18]

Fourth, a general issue of material fact exists as to whether Johnson was prohibited from distributing information at the Hendrick Math Night. Johnson had brought materials evaluating the Connected Math program and textbook. He asserts that Criswell told him to stop providing materials to the parents at the meeting. Johnson asserts that no literature in opposition to Connected Math was allowed to be displayed. Defendants argue that Johnson "was still allowed to distribute his non-school materials 'some 10-15 minutes' before the start of the math night program. . . . He also had the ability to distribute his materials and talk to other parents and teachers after the program concluded." As with Kirke, we are not permitted to resolve this genuine factual discrepancy regarding a material fact on appeal.

Fifth, if Johnson's materials were prohibited, a genuine

_____

[18] This argument also applies to Kirke's assertion that Defendants Davis and Wohlgehagen interfered with his attempt to collect signatures prior to and after the meeting, seeking support among parents to evaluate the Connected Math program.

41

issue of material fact exists as to whether Johnson's materials were prohibited because of the views expressed or because of another permissible reason. In support of viewpoint discrimination, Johnson points to Criswell's hostile response to his attempt to communicate with other parents about his concerns with Connected Math. At the Hendrick Middle School meeting, Criswell allegedly sprinted toward Johnson and shouted at him to stop distributing the materials he had brought to the meeting. Johnson alleges that Criswell was speaking to him four inches away from his face. Criswell stated that Johnson could not hand out materials unless he had reviewed them and approved them. Johnson states that when he offered Criswell the opportunity to review the Texas Education Agency report on the Connected Math textbook, Criswell forcefully declined to review it. According to Johnson's affidavit, Criswell informed Johnson that he could not distribute literature concerning the subject matter of the parents' meeting and that he should leave the building. Criswell denies raising his voice and denies asking Johnson to leave the school property. Again, questions of fact, motivation, and policy create genuine issues of material fact.

Sixth, a genuine issue of material fact exists as to whether the email memorandum was, in fact, authored by Davis[19] and whether the email supports Kirke and Johnson's argument that

---

[19]   See supra note 2.

42

school officials were targeting the views of parents like Kirke and Johnson. The memorandum specifically references individuals attempting "to circulate a petition or pass out material related to the Connected Math Program." The memorandum was allegedly created the day after the Haggard Middle School meeting and the incident involving Kirke. Davis denies authoring the email memorandum.

Finally, there is a genuine issue of material fact regarding whether Defendants Davis, Wohlgehagen, Burleson, Criswell, and Sellers restricted the distribution of information critical of Connected Math because, as they allege, they were following a content-neutral policy of disallowing all literature not pre-screened by school authorities. This justification could present a legitimate content-based (but not viewpoint-based) distinction capable of surviving First Amendment scrutiny. However, from a review of the summary judgment record, it appears that the policies on which these Defendants rely were not enacted until 1999, several months after the incidents at Math Nights. The excerpts of the school policies in the summary judgment record indicate that the policies existing at the time did not govern handouts disseminated by non-students to non-students.[20] This

_____

[20] At the time of the incident, the only policies that were in existence apparently relate to pre-clearance of materials delivered to <u>students</u>. Two policies were included in the record accompanying Plaintiffs' affidavits. The first is the "GKA (Local)" policy entitled "Community Relations: Conduct on School Premises," which was issued on February 17, 1997. This policy

43

creates a significant and material fact question posed by the Defendants as to whether the Defendants were acting under a valid school policy at the time of the Math Nights.

Therefore, for the limited purpose of evaluating a denial of summary judgment on qualified immunity grounds, we conclude that genuine issues of material fact exist supporting the allegation that Defendants Davis, Wohlgehagen, Burleson, Criswell, and Sellers violated Kirke's and Johnson's First Amendment rights. See, e.g., Burnham v. Ianni, 119 F.3d 668, 676 (8th Cir. 1997); Searcey v. Harris, 888 F.2d 1314, 1324 (11th Cir. 1989); We the People, Inc. v. Nuclear Regulatory Comm'n, 746 F. Supp. 213, 219 (D.D.C. 1990). These questions deprive us of jurisdiction, and we must dismiss these Defendants' appeal. See, e.g., Palmer v. Johnson, 193 F.3d 346, 353 (5th Cir. 1999); Smith v. Brenoettsy,

references the "FMA (Local)" policy entitled "Student Activities: Publications and Prior Review," which was issued on October 6, 1997 and which only governs student activities. Both of these policies on which Defendants apparently rely cover student publications and publications provided to students, but not materials provided to non-students.

Further, Defendants' inclusion in the record of updated versions of the policies dated April 26, 1999 does not help resolve the issue. While these new policies would control our analysis if they had been in effect at the time of the fall 1998 Math Nights, apparently they were enacted soon after the incidents at Math Nights. In fact, Defendants' reliance on policies that were enacted after the incidents creates an issue of material fact about the date on which the policies went into effect and whether the old policies covered the literature distributed to parents at the Math Nights. At the summary judgment stage, we need not resolve which policies were in effect during the Math Nights, but taking the evidence in the light most favorable to Kirke and Johnson, we are convinced that genuine material facts exist that can only be resolved at trial.

44

158 F.3d 908, 912 (5th Cir. 1998); <u>Naylor v. State of La., Dept. of Corr.</u>, 123 F.3d 855, 857 (5th Cir. 1997).[21]

To be clear, the PISD was entitled to limit Math Nights to a formal presentation on the implementation of the Connected Math pilot program. See <u>Rosenberger</u>, 515 U.S. at 829 ("The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics."). If the PISD intended to limit the event in this way, it could have constitutionally placed restrictions on expressive communication at Math Nights so long as those restrictions were reasonable in light of the purpose of the forum and did not

---

[21] Defendants also assert that, even assuming a constitutional right was violated, their actions were objectively reasonable. To determine objective reasonableness for qualified immunity, we consider whether a reasonable school official would have believed his or her conduct to be lawful in light of the clearly established law prohibiting viewpoint discrimination. See <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987). At the summary judgment stage, we are compelled to view the facts alleged in the light most favorable to Kirke and Johnson.

As described above, Defendants Davis's, Wohlgehagen's, Burleson's, Criswell's, and Sellers's actions raise genuine issues of material fact regarding whether their actions were directed at suppressing a viewpoint critical of the Connected Math curriculum. The law requires that qualified immunity be denied officials who transgress those rights of which a reasonable person would have known. See <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). A reasonable person in the Defendants' position would have been aware that the First Amendment forbids the type of viewpoint discrimination in which they are alleged to have been engaged. Whether these Defendants did engage in viewpoint discrimination in an objectively unreasonable manner involves resolving the fact issues that are unreviewable on this interlocutory appeal. Without jurisdiction, we are required to dismiss the appeal.

45

suppress a certain viewpoint.  The fact that the PISD could have controlled expression at Math Nights in a reasonable, viewpoint-neutral manner does not necessarily mean that it did so in the instant case.  While the PISD may have intended a limited presentation at Math Nights, it might also have intended to designate Math Nights as an open forum for debating math curriculum.  In that case, any limit on speech related to math curriculum would be subject to strict scrutiny.  Since our close examination of the summary judgment evidence surrounding Math Nights raises genuine issues of material fact regarding viewpoint-based discrimination directed at the First Amendment activities of Kirke and Johnson, we do not have appellate jurisdiction over Defendants' interlocutory appeal from the denial of summary judgment based on qualified immunity with respect to the allegations made by Kirke and Johnson related to Math Nights.

## 3. Viewpoint Discrimination in the School Mail Delivery System

The question of viewpoint discrimination also arises in Brooks's denial of Jenkins's request to use the school mail delivery system to distribute MathChoice flyers.  As stated <u>supra</u> in Part III, our appellate jurisdiction to decide the issue of qualified immunity when the district court has determined that issues of material fact preclude summary judgment is quite limited.  First, regarding whether Jenkins has established a violation of a clearly established right, "[w]e assume

46

plaintiff's version of the facts is true, then determine whether those facts suffice for a claim of [the constitutional violation alleged]." Wagner v. Bay City, 227 F.3d 316, 320 (5th Cir. 2000). Second, regarding whether Brooks acted in an objectively unreasonable manner, "we review the complaint and record to determine whether, assuming that all of [Jenkins's] factual assertions are true, those facts are materially sufficient to establish that defendant[] acted in an objectively unreasonable manner." Id.

Even under our circumscribed review of Jenkins's factual assertions, we cannot conclude that the requisite viewpoint discrimination exists in Brooks's denial of Jenkins's request to distribute the MathChoice petition through the school mail delivery system. Therefore, we must reverse the district court's denial of summary judgment based on qualified immunity on the claim.

Under Perry and Garland, it is established that school officials may regulate school mail systems through content-neutral means and on the basis of speaker identity. See Perry, 460 U.S. at 44; Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 777 F.2d 1046, 1050 (5th Cir. 1985). In the instant case, Brooks contends that she was following a non-content-based school policy that states: "Only non-profit groups providing programming or services for students are allowed to send flyers or

47

information home with students."[22]

Jenkins responds that MathChoice is such a non-profit group and thus fits within the school policy. We disagree that MathChoice fits within the type of group allowed access to the school mail delivery system. Further, the subject matter of the flyer — in this case a politically oriented petition directed to parents — is not of a similar character to any previous use of the school mail delivery system. Cf. Perry, 460 U.S. at 48 (recognizing that even in a limited public forum, "the constitutional right of access would in any event extend only to other entities of similar character."); see also Garland, 777 F.2d at 1052.

Evaluating the MathChoice organization and the proposed flyer in the context of the school policy, we are convinced that no viewpoint discrimination exists. First, MathChoice, while a non-profit organization, was created to organize parents in the PISD and not to provide programming or services to students. Whether characterized as a community organizing group or a

_____

[22] We recognize that Brooks has not submitted an official copy of this policy in the record. Further, we recognize that when Jenkins requested copies of the official policy from Brooks, she was referred to the "FMA (Local)" policy and the "GKA (Local)" policy, see supra note 21, which do not explicitly cover the school mail delivery system. This discrepancy, however, does not change our determination. The touchstone of our First Amendment analysis is whether the regulation of a nonpublic forum is accomplished in a reasonable viewpoint-neutral manner. As discussed above, we are satisfied that access to the school mail delivery system was regulated in such a manner.

48

narrowly focused political advocacy group, the organization's sole purpose was to effect change in the PISD. This fact distinguishes MathChoice from the other organizations that have used the school mail delivery system. Second, the subject matter of the flyer is not a program or service for students. The flyer and its call for community involvement is directed at mobilizing and informing parents. Finally, petitions for political or community action are not similar in kind to the types of services provided in previous flyers that were sent through the school mail delivery system.

Identity-based and subject matter distinctions in a nonpublic forum are perfectly permissible so long as they are not a covert attempt to suppress a particular viewpoint and are reasonable in light of the purpose of the forum. In this case, the PISD policy is a reasonable attempt to regulate a medium of communication that involves distributing information through students to take home to their parents. We conclude, therefore, that Brooks's decision to deny access to the school mail delivery system to a political petition was thus not based on the viewpoint expressed.

Even assuming, arguendo, that viewpoint discrimination could be alleged, we conclude that Brooks's actions in denying Jenkins's request to distribute a political petition to be objectively reasonable. See Perry, 460 U.S. at 44; Garland, 777 F.2d at 1050. Accordingly, in regard to Brooks, we reverse the

district court's denial summary judgment on qualified immunity grounds.

## VII. CONCLUSION

For the foregoing reasons, we DISMISS for lack of jurisdiction Defendants Davis, Wohlgehagen, Burleson, Criswell, and Sellers's appeal from the denial of summary judgment on qualified immunity grounds.  The costs of this appeal (other than Defendant Brooks's costs) shall be borne by those Defendants.  We REVERSE the denial of summary judgment on qualified immunity grounds as to Defendant Brooks.  Defendant Brooks's costs shall be borne by Plaintiffs.