# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 22, 2010

No. 08-40833

Charles R. Fulbruge III
Clerk

JULIE FAIRCHILD,

Plaintiff - Appellant

v.

LIBERTY INDEPENDENT SCHOOL DISTRICT; MONA CHADWICK,
individually and in her official capacity as Superindentendent; BRUCE
LACEFIELD, Individually and in his official capacity as Principal; TOM
CONNELLY, Individually Capacity; JESSICA BARRIER LANIER, Individual
Capacity; FRANK DAVIS, Individual Capacity; WILLIAM BEDNAR, Individual
Capacity; KAREN JOHNSON, Individual Capacity; MATTHEW HARRIS,
Official Capacity,

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM and STEWART, Circuit Judges, and *FELDMAN,
District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Julie Fairchild – asserting that the Liberty Independent School District

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

No. 08-40833

had infringed her constitutionally protected speech – sued the District and several of its officials. She claimed the District – after firing her – did not allow her at a school board meeting to present her side of her troubles with a teacher for whom she had been an aide, issues then on an alternative-track review before consideration by the Board. The district court granted the defendants summary judgment on all claims, and Fairchild appealed. We affirm the judgment but travel a somewhat different path than did the district court.

I.

Fairchild worked for the District as a teacher's aide for special needs children in Jessica Barrier Lanier's classroom.[1] The two did not get along, and the District eventually fired Fairchild in May of 2005. The next day, Fairchild submitted a post-termination grievance. She alleged that the District had terminated her in retaliation for accusing Barrier Lanier of such things as overdosing children with prescription medicine, lifting a severely handicapped student by her hair and belt loops, and shopping for her wedding during school time.[2]

Two District policies, DGBA (Local) and BEC (Legal), govern employee concerns and grievances.[3] DGBA (Local) requires employees to follow a three-

---

[1] Fairchild also has three children who during the relevant time period attended District schools.

[2] The District maintains that it fired Fairchild for creating a classroom environment not conducive to learning.

[3] The District adopted DGBA (Local) and BEC (Legal) in an effort to comply with the Texas Open Meetings Act. The Act mandates that "[e]very regular, special, or called meeting of a government body shall be open to the public," subject to various exceptions. TEX. GOVT. CODE § 551.002. One exception regards employee-on-employee complaints and reads: "This

No. 08-40833

tiered administrative process in which the school board for the first time directly hears and deliberates on the matter at Level III. Per BEC (Legal), the Board will hear the employee concern in closed session, unless the target of the concern demands a public hearing.

At Level I Fairchild alleged that the District had terminated her for trying to blow the whistle on Barrier Lanier; that she posed a danger to the children and should be fired. The District denied Fairchild's Level I grievance. Fairchild then progressed on two parallel tracks – one within the District and one outside of it. She filed for a Level II hearing, and, after failing to reach an agreement, she requested a Level III (and final) hearing. In the meantime, Fairchild reported Barrier Lanier to Child Protective Services, and began a parents' petition asking the District to be more forthcoming with information regarding special needs children – and demanding that the District not retaliate against any employee who shares information about an endangered child.

All of this came to a head on August 16, 2005. That night, the District held a school board meeting. At the beginning of its meetings, the Board allows public comment on Board business. It resolves no disputes at this opening comment session and decides no questions. Rather, issues requiring resolution must proceed through alternative channels. When commentary moves to issues with named teachers or individual employees, the Board notes it as matter beyond the scope of the opening session, and the speaker must first proceed through an alternative process. This decision steers away personal grievances

---

chapter does not require a school board to conduct an open meeting to deliberate in a case . . . in which a complaint or charge is brought against an employee of the school district by another employee and the complaint or charge directly results in a need for a hearing." Tex. Govt. Code § 551.082.

No. 08-40833

or examinations of individual performance, both of which would necessitate reply and a frustration of the Board's agenda. It also avoids a frustration of the policy of not hearing personnel (including employee-on-employee) grievances in public absent the consent of the employee whose performance is questioned. After the opening comment session, the Board moves to the remainder of its meeting agenda – sometimes in open and sometimes in executive sessions.

The Board scheduled Fairchild to speak during the comment session of the August 16 meeting to allow her to present her petition. Fairchild had to sign a statement acknowledging that: "[A]ny issues pertaining to . . . specific . . . district personnel . . . may necessitate a closed session." She had to further acknowledge, "This comment period is not intended for the presentation of complaints. The Board will only consider complaints that remain unresolved after they have been addressed through proper administrative channels and when they have been placed on the agenda." Additionally, the District has in place an enforcement rule which governs all public meetings; it states in part:

> The Board shall not tolerate disruption of the meeting by members of the audience. If, after at least one warning from the presiding officer, any person continues to disrupt the meeting by his or her words or actions, the presiding officer may request assistance from law enforcement officials to have the person removed from the meeting.

At the same meeting, the Board decided to hold Fairchild's Level III grievance hearing, which would commence after the open session. As required by BEC (Legal), the Level III grievance would close, this because Fairchild sought to level charges against Barrier Lanier.

No. 08-40833

But Fairchild requested a different procedure – a hearing and decision on her Level III appeal in the open session of the meeting. She cited the Texas Open Meetings Act: "This chapter does not require a governmental body to conduct an open meeting to deliberate the appointment, employment, evaluation, reassignment, duties, discipline, or dismissal of a public . . . employee . . . [unless] the . . . employee who is the subject of the deliberation or hearing requests a public hearing."[4] Even though she sought with her grievance to attack Barrier Lanier, Fairchild contended that her hearing bore on her own firing. That is, she was the "subject" of a negative employment "deliberation" – and she demanded an open session. The District compromised – telling Fairchild that she could have her public hearing but that, if it moved to employee-on-employee concerns, the session would close pursuant to BEC (Legal).

Ultimately, during the August 16 meeting Fairchild presented her petition in the comment session without interruption – not mentioning school employees by name. She also had her Level III grievance in the closed session, as scheduled. There, Fairchild made her complaints against Barrier Lanier and sought to "clear" her own name. In the end, the District denied the relief sought in the post-termination grievance hearing.

II.

Fairchild brought this action in federal district court to contest the procedures used at the August 16 Board meeting. She alleged that: (1) the District had misinterpreted the Texas Open Meetings Act, because the Act

---

[4]TEX. GOVT. CODE § 551.074.

requires a public grievance hearing; (2) in the alternative, the Act is unconstitutional as applied to her in that it closed her Level III grievance hearing; (3) the District had retaliated against her for trying to blow the whistle on Barrier Lanier; (4) the District's public comment rules, collectively called BED (Local), which she claims do not allow parents in the opening comment session to complain against teachers, are facially unconstitutional; (5) the District's policies DGBA (Local) and BEC (Legal) violate the First Amendment, both on their face and as applied to Fairchild's post-termination grievance hearing; and (6) the individual District administrators and teachers had deprived her of constitutional (First Amendment) rights and should be held liable under § 1983.

Through the course of multiple voluminous motions, the district court granted summary judgment to all defendants on all claims. On appeal, there remains only a facial challenge to the rules concerning the comment session of the Board meeting and both a facial and as-applied challenge to the closing of Fairchild's grievance hearing.[5]

Our review is de novo, and we may affirm a grant of summary judgment on any grounds supported by the record – including grounds different than those relied upon by the district court.[6]

---

[5] That is, only the above claims 4, 5, and 6 remain.

[6] *See Berquist v. Washington Mut. Bank*, 500 F.3d 344, 348-49 (5th Cir. 2007).

No. 08-40833

III.

A.

We begin with Fairchild's facial attack on the comment session rules, BED (Local).[7] The district court granted summary judgment to the defendants, persuaded Fairchild had not shown the injury essential to Article III standing. We hold that Fairchild has standing to bring her First Amendment facial challenge to the comment portion of the Board meeting and affirm the summary judgment on the merits.

i.

A plaintiff must meet both the constitutional demands of Article III standing as well as instrumental prudential concerns.[8] Prudential considerations are judicially-imposed and are seen as jurisdictional in reach.[9] Article III "standing has three elements: (1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury."[10]

In First Amendment facial challenges, federal courts relax the prudential

---

[7] We – like the litigants – use BED (Local) as a stand-in for the District's general policy of channeling disputes from the comment session of Board meetings, absent agreement to public discussion by the targeted person.

[8] *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004).

[9] *See id.* at 12.

[10] *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

7

No. 08-40833

limitations and allow yet-unharmed litigants to attack potentially overbroad statutes – "to prevent the statute from chilling the First Amendment rights of other parties not before the court."[11]  At the same time, Article III standing retains rigor even in an overbreadth claim.[12]  The defendants allege, and the district court found, that Fairchild had not shown the requisite injury-in-fact. We disagree.

"Chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement."[13]  Fairchild alleges that BED (Local) chills public speech by forbidding the disclosure of information about specific teachers during open Board meetings.  More to the point, Fairchild asserts that she had to reign in her own speech during the August 16 comment session.  Asked in her deposition, "[I]s there anything that you didn't get to say to the school board during the [August 16] open meeting that you wanted to say?"  She responded, "Yes, I would like to have used the [teachers'] names . . . and they would not allow me any of the names or any of that."[14]  The District concedes Fairchild would not have been allowed during the comment session presentation of her parents' petition to attack the work of the teacher whom she had aided.[15]

---

[11] *Secretary of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956-58 (1984).

[12] *See id.* at 958.

[13] *Houston Chronicle Publ. Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007) (citing *Meese v. Keene*, 481 U.S. 465, 473 (1987)); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

[14] R. at 2959-60.

[15] *See* R. at 3060-61.

No. 08-40833

Fairchild has satisfactorily shown that she is "seriously interested in"[16] engaging "in a course of conduct arguably affected with a constitutional interest, but proscribed by statute,"[17] a sufficient Constitutional injury.  We turn to the merits of her facial attack on the comment session rules, BED (Local).[18]

ii.

Fairchild seeks an injunction to prevent the District from enforcing its BED (Local) policy.  She brings only a claim of facial invalidity.[19]  "[A] court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.  If it does not, then the overbreadth

---

[16] *Int'l Soc. for Krishna Consciousness v. Eaves*, 601 F.2d 809, 818 (5th Cir. 1979) (citations omitted).  A fair reading of the record supports Fairchild's assertion that she wanted publicly to name District employees.  In fact, there is a clear nexus between Fairchild's Level III grievance (in which she did mention Barrier Lanier by name) and the petition she presented in the comment portion of the Board meeting.  In her grievance hearing Fairchild alleged that the District had fired her for telling an administrator that Barrier Lanier endangers the special needs children.  Not coincidentally, one of the items on her petition urged the District to "[i]ssue a directive to all school administrators that they may not fire . . . any employee . . . because the employee . . . provides information concerning a child with special needs . . . to an administrator of the Liberty ISD . . . ."  R. at 122.

[17] *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008) (citations omitted).

[18] We do not fault the able district court for coming to a contrary conclusion.  Indeed, although Fairchild asserted that she had suffered an injury, she never – even upon prompting – pointed the district court to proper record evidence to support standing.  In independently reviewing the full summary judgment record, though, we find the standing question to be based on evidence "we could not ignore . . . even though the parties did not point the evidence out and the district court had not considered it."  *See John v. Louisiana (Bd. of Trustees)*, 757 F.2d 698, 712 (5th Cir. 1985).

[19] Here, Fairchild does not make an as-applied challenge to the comment session procedure – BED (Local).  Later, she challenges the employment grievance procedure – DGBA (Local) – both facially and as-applied.

No. 08-40833

challenge must fail."[20]  If the ordinance passes the overbreadth test, the court moves to "examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications."[21]

We must start by determining exactly what the policy entails.  In doing so, we find that BED (Local) is amenable to a proffered limiting construction.[22]  The BED (Local) written policy states under the heading Public Comment: "At regular meetings, the Board shall allot time to hear persons who desire to make comments to the Board."  The policy further explains how the Board must respond during the comment session: "Specific factual information or recitation of existing policy may be furnished in response to inquiries, but the Board shall not deliberate or decide regarding any subject that is not included on the agenda posted with notice of the meeting."  Regarding Complaints and Concerns: "The presiding officer or designee shall determine whether a person addressing the Board has attempted to solve a matter administratively through resolution channels established by policy.  If not, the person shall be referred to the

---

[20] *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 (1982).

[21] *Id.* at 494-95.

[22] *Id.* at 494 n.5 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("[W]e must extrapolate [the ordinance's] allowable meaning.  Here, we are relegated to the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it.  Extrapolation, of course, is a delicate task, for it is not within our power to construe and narrow state laws.") (citations and punctuation omitted)); *see also Hill v. City of Houston*, 789 F.2d 1103, 1123 (5th Cir. 1986) (en banc) (Higginbotham, J., dissenting) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)) ("[I]f the challenged law has been, or could be, authoritatively construed so as to remove any realistic threat of unconstitutional application, the overbreadth doctrine may not be used to declare the law unconstitutional on its face.").

No. 08-40833

appropriate policy . . . to seek resolution."

During his deposition, Board president Frank A. Davis – a local minister in Liberty, Texas – explained the nuances of the written policy. During the opening session, the residents can present comments having to do with Board business. He described that the Board's "duty there is to listen and we do not deliberate."[23] The Board – despite Fairchild's assertions to the contrary – allows the public to voice concerns and complaints, just not if the "complaint involve[s] naming of people" – employees or students.[24] This rule dovetails with another of the Board's default policies to discuss behind closed doors "Personnel Matters" – including "the appointment, employment, evaluation, reassignment, duties, discipline, or dismissal of a public . . . employee . . . ."[25]

---

[23] R. at 3612.

[24] *See* R. at 2945. As part of her facial challenge, Fairchild argues that a policy called FNG (Local) contributes to the unconstitutionality of BED (Local). FNG (Local) provides for a three-tiered parents' grievance process – similar to the administrative process provided for employee grievances. Fairchild claims that – in contrast to Davis's explanation – when parents seek generically to complain in the comment session, BED (Local) forces these complaints into an extended FNG (Local) remedial process. Although BED (Local) does say that parent concerns "shall be referred" to FNG (Local), "referring" does not mean "silencing." BED (Local) prevents the Board from acting during the comment session, so FNG (Local) actually assists the parents in seeking resolution – by pointing them to an outlet at which the Board can deliberate. Nothing on the face of BED (Local) says that parents cannot at the comment session air their concerns and then subsequently pursue FNG (Local). That is, the comment session and FNG (Local) are not mutually exclusive. The comment session sign-in sheet is not to the contrary. The paper reads: "This comment period is not intended for the presentation of complaints. The Board will only consider complaints that remain unresolved after they have been addressed through proper administrative channels and when they have been placed on the agenda." On its face, this note merely communicates the BED (Local) rule that the Board cannot deliberate or take action during the comment session. The sign-in sheet is not a threat or a warning – rather, it explains the limits of the Board's power. The Board can "listen" to complaints during the comment session, but it cannot "deliberate on" or "consider" them.

[25] *See* R. at 1546.

11

No. 08-40833

Experience confirms Davis's representations. Fairchild complained during the comment session without interruption. Indeed, the petition she presented asserted that parents "reasonably believe[d] that we have been denied access to important information concerning [special needs] children." Fairchild even demanded that the Board "[i]ssue a directive to all school administrators that they may not fire . . . any employee . . . because the employee . . . provides information concerning a child with special needs . . . to an administrator . . . ."[26] A familiar exhortation, as Fairchild claimed that the District had fired her for sharing information about dangers to special needs students. Because Fairchild did not divulge personally identifiable information at the comment session, the Board – which interpreted Fairchild's speech as a parent "concern"[27] – never interrupted her presentation of complaints. Additionally, another citizen – Glenda Heller – twice at Board meetings complained that the District's high school did not have adequate wheelchair accessibility. With no Board interference, she challenged the Board to negotiate the school grounds in wheelchairs.[28]

Responsive to the "well-established principle that statutes will be interpreted to avoid constitutional difficulties," we decline to read the text expansively. Rather, we agree with the Board's construction.[29] BED (Local)

---

[26] R. at 3222-23.

[27] R. at 3752.

[28] *See* R. at 3872.

[29] *Frisby v. Schultz*, 487 U.S. 474, 483 (1988). The Supreme Court in *Frisby* adopted a limiting construction when the "narrow reading [was] supported by the representations of counsel for the town at oral argument." *Id.* In this case, the Board president – and not just his lawyer – explained the narrowness of the District policy. More importantly, Davis's

No. 08-40833

opens a session for the public to air concerns about Board business – but it is not an occasion for resolution of personal disagreement with employees. Those must first proceed through an alternative process where they will either be resolved or sharpened for Board resolution.

a.

We start with overbreadth, asking if BED (Local) infringes a substantial amount of protected speech. In doing so, we must identify the type of forum the opening session represents, because "our determination of the character of the forum in which expression was regulated shapes our determination whether . . . a constitutional violation occurred."[30]

There are three categories of forums, only the first two of which are relevant here: (1) traditional and designated public forums; (2) limited public forums; and (3) nonpublic forums.[31] Traditional public forums include sidewalks, streets, and parks that the public since time immemorial has used for assembly and general communication.[32] The state can also intentionally create "designated" public forums on other state property for the same widespread use

_____

explanations derive logically from the literal text of the policies, and Fairchild presents no contradictory evidence.

[30] *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001).

[31] *See id.* at 344-45.

[32] *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens."); *Chiu*, 260 F.3d at 344.

No. 08-40833

as traditional public forums.[33] Regulation of speech in traditional or designated public forums must pass strict scrutiny with a compelling state interest and narrow tailoring.[34]

Limited public forums – as the name suggests – provide "for public expression of particular kinds or by particular groups."[35] The government may restrict speech in these limited public forums, as long as the regulation "(1) does not discriminate against speech on the basis of viewpoint and (2) is reasonable in light of the purpose served by the forum."[36] A restriction based on subject matter "may be permissible if it preserves the purposes of that limited forum."[37]

The action – in this case and most others – exists at the line between designated and limited public forums.[38] On one side, "a designated public forum [is] open for indiscriminate public use for communicative purposes."[39] On the other side lies the limited public forum – where the government may "legally

---

[33] *Chiu*, 260 F.3d at 345.

[34] *Id.* at 344-45.

[35] *Id.* at 346 (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)).

[36] *Id.* at 346 (citing *Good News Club*, 533 U.S. at 106) (quotation marks omitted); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) ("[T]he State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.").

[37] *Rosenberger*, 515 U.S. at 830.

[38] *See Chiu*, 260 F.3d at 346 ("Though the Supreme Court now clearly distinguishes designated public forums subject to strict scrutiny from limited public forums that are not, the line separating the two categories remains undefined.").

[39] *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993).

No. 08-40833

preserve the property under its control for the use to which it is dedicated. The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics."[40]  "In distinguishing between the two types of forums, our precedent directs us to focus on two factors: (1) the government's intent with respect to the forum, and (2) the nature of the forum and its compatibility with the speech at issue."[41]

The Board meeting here – and the comment session in particular – is a limited public forum "for the limited time and topic of the meeting."[42]  "Plainly,

---

[40] *Rosenberger*, 515 U.S. at 829 (citing *Lamb's Chapel*, 508 U.S. at 390; *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985); *Perry Educ. Assn.*, 460 U.S. at 49).

[41] *Chiu*, 260 F.3d at 346 (citations and quotation marks omitted).

[42] *Id.* at 348.  Fairchild insists that school board meetings are always designated public forums – citing for support to *City of Madison Joint School District Number 8 v. Wisconsin Employment Relations Commission*.  429 U.S. 167 (1976).  That case did not so hold.  The Supreme Court confronted a state law that prohibited non-union teachers from speaking at a public school board meeting, declaring that "when the board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of their employment, or the content of their speech." *Id.* at 176. Context reveals that – with the phrase "content of their speech" – the Court meant "viewpoint." Indeed, immediately before the above-quoted sentence, the Court explained that "the participation in public discussion of public business cannot be confined to one category of interested individuals.  To permit one side of a debatable public question to have a monopoly in expressing its views to the government is the antithesis of constitutional guarantees." *Id.* at 175-76.  Because the state law discriminated based on viewpoint – unlawful in any forum – forum analysis did not bear on the outcome.  Not to mention that the case preceded by several years the Court's modern articulation of forum analysis. *See, e.g.*, *Rosenberger*, 515 U.S. 819.  Even read broadly, the Court at most held that the Madison school board meeting was a designated public forum – not that all school board meetings would be.  Our caselaw confirms this understanding.  The Supreme Court has held "the meeting facilities of a . . . public school board meeting . . . to be [a] forum[] for expressive activities by the general public or by a class of speakers" (*Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 378 (5th Cir. 1989) (citing *City of Madison*)) and that "school board meetings can rise to the level of designated

15

No. 08-40833

public bodies may confine their meetings to specified subject matter and may hold nonpublic sessions to transact business,"[43] and the Board meeting here fits the hornbook definition of a limited – not designated – public forum, in which "the State is not required to and does not allow persons to engage in every type of speech."[44]  The Board policies exclude from public discourse certain topics of speech – including individualized personnel matters – which the Board channels into more effective dispute resolution arenas, before it hears the matter and resolves it.  So limited, the Board meeting defies categorization as a designated public forum, because "[t]he government [can]not create a [designated] public forum by inaction or *by permitting limited discourse . . . .*"[45]

Close analysis only confirms these axiomatic observations.  Turning first to the District's intent in creating the comment session, we push aside "self-serving statements regarding the purpose of the meeting"[46] for objective evidence leavened by common sense.  The Board opens its meetings for a short duration to hear comments relevant to this part of its agenda.  But this item of the agenda as designed and limited is not for dialogue or decision-making.  Rather it is a learning and routing mechanism.  By its rules the Board does not engage the public in debate, because it may not deliberate or take action at this

---

public forums" (*Chiu*, 260 F.3d at 348 (citing *City of Madison*)).  But *City of Madison* also said "[p]lainly, public bodies may confine their meetings to specified subject matter and may hold nonpublic sessions to transact business."  429 U.S. at 175 n.8.

[43] *City of Madison*, 429 U.S. at 175 n.8.

[44] *Good News Club*, 533 U.S. at 106.

[45] *Cornelius*, 473 U.S. at 802 (emphasis supplied).

[46] *Chiu*, 260 F.3d at 349 n.13.

## No. 08-40833

juncture. Instead, the Board – when prompted – can recite only policy and list facts. At the comment session, the Board is to alert a speaker to an administrative proceeding at which the speaker may be heard and seek a remedy or the Board may put that topic on future agendas. It follows that quarrels between employees and rehearsals of disputes moving through the administrative process have no place in the comment session and are not here reflective of viewpoint preference. The Board has limited the comment session to flagging issues for potential in-depth follow-up, diverting controversies that surface to an alternative hearing path to be developed before being resolved by the Board. The Board has a strong and speech-neutral interest in setting an agenda and paths to Board hearings to avoid irrelevant topics or extended contentious debate.

While the Board has here a limited public forum, its policies must be both viewpoint-neutral and reasonable in light of the forum's purpose. They are plainly both. There is no evidence that the Liberty school board discriminates based on the view or identity of a given speaker. A speaker may discuss concerns generally (as Fairchild did), but cannot move to the merits of an extant dispute. To do so could derail the agenda for the meeting and risk unnecessary disclosure of private information about employees or students.[47]

And the rule is reasonable. The Board has a legitimate interest, if not state-law duty, to protect student and teacher privacy and to avoid naming or

---

[47] Fairchild's examples of publically spoken "praise" at Board meetings do not alter the analysis of the facial attack. Indeed, the cited laudatory comments – which included thanking certain people for painting a gym (R. at 1775) – did not deal with personnel matters such as "appointment, employment, evaluation, reassignment, duties, discipline, or dismissal" – and so did not fall under a District policy. They do not contemplate further action by the Board and hint of no focused dispute to be resolved.

No. 08-40833

shaming as potential frustration of its conduct of business. As the Ninth Circuit has explained, "the usual [F]irst [A]mendment antipathy to . . . control of speech cannot be imported into [government meetings] intact. . . . While a speaker may not be stopped from speaking because the moderator disagrees with the viewpoint he is expressing, it certainly may stop him if his speech becomes irrelevant or repetitious."[48] Where the Board cannot take immediate responsible action, it need not suffer one side of a dispute awaiting resolution by alternative channels. In short, the Board did not open the comment session of its agenda to create a dispute resolution forum, anticipating that issues that do arise can be channeled into and heard at one of the Board's robust grievance processes. This leaves the public ample opportunity to be heard – just not here and now.

So understood, the seeming viewpoint index of not allowing attacks upon an individual in its limited public forum disappears. The District excludes resolution of the merits of disputed individual performance in its limited forum, and to allow the charges of one side would force allowance of a response – a frustration of this studied effort to manage its agenda. In short, the Board's agenda does not allow at this time and place charges against its teachers. Rather, it reroutes them for further treatment.

Although forum analysis lights the path to the correct result, it bears emphasis that the Board's rules ultimately do not constrain by the content of protected speech but rather do no more than limit the time, place, and manner for its expression.[49] Absent the afforded alternative paths for expressing this

---

[48] *White v. Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990).

[49] "Deciding whether a particular regulation is content-based or content-neutral is not always a simple task. [The Supreme Court has] said that the 'principal inquiry in determining content-neutrality . . . is whether the government has adopted a regulation of speech because

No. 08-40833

category of protected speech we would be faced with a quite different case. Where boundary lines of forum use cross to content and viewpoint discrimination can be elusive, and we do not suggest that in application a content-neutral rule cannot offend. As we have just observed, the absence of alternative paths for expression here would be difficult to defend and a content-neutral rule may be calculated to step upon speech – here, for example, public criticism of teachers. This record supports neither of these possible First Amendment failings of an otherwise permissible content-neutral rule. Finally, it may be suggested that the fit between the District's ends and its means are insufficiently exact.[50] We are unpersuaded. These rules were designed to serve a substantial government interest and allow for reasonable alternative communication.[51]

Under the limiting construction of BED (Local), the policy does not infringe a "substantial" amount of protected speech. "Application of the overbreadth doctrine . . . is, manifestly, strong medicine. It has been employed

---

of [agreement or] disagreement with the message it conveys.'" *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). The District does not take sides and justifies its generally-applicable rules without reference to the content of the regulated speech. *See Renton v. Playtime Theatres*, 475 U.S. 41, 48 (1986); *Horton v. City of Houston*, 179 F.3d 188, 193 (5th Cir. 1999) ("[T]his court has noted that government regulations that apply evenhandedly to all speakers weigh in favor of finding content-neutrality." (citing *Int'l Soc'y for Krishna Consciousness of New Orleans, Inc. v. Baton Rouge*, 876 F.2d 494, 497 (5th Cir. 1989))). The District's predominate – indeed only – concerns are with frustration of the Board's agenda and divulgence of private information, not with the content of any particular dispute.

[50] *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981); *id.* at 528 (Brennan, J., concurring) ("The city has failed to provide adequate justification for its substantial restriction on protected activity." (citing *Schad v. Mount Ephraim*, 452 U.S. 61, 72 (1981))).

[51] *Renton*, 475 U.S. at 50.

No. 08-40833

by the Court sparingly and only as a last resort."[52] We have no reason today to write that prescription.[53]

b.

Fairchild wisely does not push the vagueness prong, as it lacks merit. "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."[54]

Fairchild offers no evidence that the Board has ever gagged a speaker, or that the police have removed a speaker from a Board meeting. Regardless, for the government to prosecute a person for causing a disturbance at a Board meeting, the speaker – after warning – must persist in the disturbance. Nothing unascertainable here to people of common intelligence. Indeed, the predicate warning – like a scienter requirement – cleanses this law of any difficulty in

---

[52] *Broadrick*, 413 U.S. at 613.

[53] Our rejection of the BED (Local) overbreadth claim leaves the door open to as-applied challenges – the merits of which are less than apparent but not before us.

[54] *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)). We have similarly noted that "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk. On the other hand, an ordinance is vague . . . where it subjects the exercise of [a] right . . . to an unascertainable standard, or if, in other words, men of common intelligence must necessarily guess at its meaning." *United States v. Clark*, 582 F.3d 607, 613 (5th Cir. 2009) (citing *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971); and *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)) (internal quotation marks omitted).

## No. 08-40833

understanding.[55]    If the moderator asks you to cease, stop doing it.    For essentially the same reasons, nothing in BED (Local) fails adequately to guide law enforcement officials.    The police can only remove a speaker after the speaker receives warning to stop disrupting the meeting.[56]

### B.

Fairchild wanted the Board to hold her post-termination grievance hearing in public, but – because she sought also to ask the Board to fire Barrier Lanier – the Board closed Fairchild's hearing pursuant to DGBA (Local) and BEC (Legal).    Unlike with the comment session policy – where she brought only a facial challenge – Fairchild offers both an as-applied and facial challenge to the post-termination grievance policies.    We apply the same analytical framework as we did to Fairchild's claim against BED (Local), and – because of the similarity between the policies – we, not surprisingly, come to the same result.

Fairchild's post-termination hearing represented a limited public forum. The Board by definition intended that Fairchild use this hearing merely to appeal her termination.    At these hearings, only the employee, counsel, witnesses, and District can speak.    The Board may only consider the issues and documents presented at Levels I & II.    A soapbox the grievance hearing is not. And a Level III termination appeal restricting ancillary topics is necessary to implementing the Board's narrow purpose of resolving the appeal at hand.

---

[55] *See Hill*, 530 U.S. at 732 (explaining that a "knowing" scienter made the statute in that case not vague).

[56] We note that Fairchild's analogies to licensing schemes miss the mark.    The record does not reveal the Board to have "unfettered discretion" to silence speakers during the comment session, and presenting does not require a license.

No. 08-40833

The Board's restrictions in this limited forum are both viewpoint-neutral and reasonable. The Board by default closes discussion of personnel matters. The subject matter of the closed hearings includes both "appointment" and "dismissal" – opposite sides of the same coin. Additionally, the District's rule directly serves substantial state interests in employee privacy and disciplined agenda while ensuring the accuracy of information disclosed at the hearing. On their face, the policies do not infringe a "substantial" amount of protected speech.

Turning specifically to Fairchild's termination appeal, the Board mechanically applied its otherwise valid policies. Fairchild asked the Board to hold her hearing in public, which it would have done. Fairchild, though, sought in the hearing to complain about a District employee – Barrier Lanier – and to ask that the Board fire her. This triggered BEC (Legal), a reasonable, viewpoint-neutral rule of general applicability: the Board will hear in closed session matters relating to "the appointment, employment, evaluation, reassignment, duties, discipline, or dismissal of a public . . . employee" – unless the subject of that personnel matter requests otherwise. Although Fairchild wanted her own issues aired to the public, she also wanted to seek dismissal of Barrier Lanier, a different employee who did not. We are persuaded that the Board's Level III termination appeal policies did not violate Fairchild's First Amendment rights.

AFFIRMED.